IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

|  |  |
|---|---|
| **Andrew Senior** | ) |
| *Plaintiff,* | ) |
| v. | ) |
| **IHS Press, Inc.** | ) Case No.: 2:25-cv-394 |
| Serve: | ) |
| IHS PRESS, INC.<br>c/o John Sharpe, Registered Agent<br>222 West 21st Street<br>PMB 122 Suite F<br>Norfolk, Virginia 23517 | ) |
| *Defendant.* | ) |

## COMPLAINT

**COMES NOW** Plaintiff Andrew Senior (hereinafter "Senior" or "Plaintiff"), by and through undersigned counsel, to make this his Complaint against Defendant IHS Press, Inc. (hereinafter "IHS" or "Defendant"), and in support of same, respectfully submits the following:

### PARTIES

1. Plaintiff Andrew Senior (hereinafter "Senior" or "Plaintiff") is a natural individual and the rightful holder of the exclusive intellectual property rights to John Senior's[1] academic works, which are the subject of this dispute. He resides in Manhattan, Kansas.

2. IHS Press, Inc. (hereinafter "IHS" or "Defendant") is a non-stock, non-profit corporation founded under the laws of the Commonwealth of Virginia, with a principal place

---

[1] Dr. John Senior was a prominent and influential Catholic author and lecturer as well as Mr. Andrew Senior's late father.

of business address of 222 West 21st Street, Suite 122, Norfolk, Virginia 23517. It is in the business of publishing books that "promulgat[e] traditional Catholic Social Doctrine to the farthest reaches of the English-speaking world."

### JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction over the federal question claims pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331 and 1338. This Court has jurisdiction over the state law claims averred herein due to its grant of supplemental jurisdiction under 28 U.S.C. § 1367(A), in that the claims are so related to the federal claims made herein that they form part of the same case or controversy.

4. The Court has personal jurisdiction over the Defendant because the Defendant's principal place of business is in Norfolk County in the Commonwealth of Virginia, which is located in the United States District Court for the Eastern District of Virginia.

5. Venue is proper in this district under 28 U.S.C. § 1391(b)-(c). The Defendant conducts business and has a headquarters in this judicial district, and a substantial part of the events giving rise to this claim occurred in this judicial district.

### STATEMENT OF FACTS

6. All preceding paragraphs are incorporated by reference herein.

7. On June 26, 2007, IHS and Senior entered into an Exclusive Publication Rights Agreement (hereinafter "Agreement") for the rights to publish the works of Senior's late father, Dr. John Senior (hereinafter "Author"). Ex. A – Agreement.

8. The Agreement states that IHS shall pay to Senior: "(1) a royalty of twenty-five per cent (25%) of the net actual income obtained by the Publisher in respect of sales of copies of the Publisher's edition of the Works distributed and sold pursuant to Section 1.a(1) of the Agreement,

(2) for the rights granted to license the works to third parties pursuant to Section 1.a(2)(a), fifty percent (50%) of any royalties received by the Publisher from other parties licensed to utilize this Works [sic] in written (printed or electronically reproduced) form, (3) a royalty of sixty (60%) of the net actual income obtained by the Publisher in respect of sales of electronic reproductions of the Publisher's edition of the Works in any format of the Medium distributed and sold by the Publisher pursuant to Section 1.a(2)(b) of the Agreement, and (4) for the rights granted to license the Works for adaptation in any format of the Medium pursuant to Section 1.a(2)(b), seventy (70) percent (70%) of any royalties received by the Publisher from other parties licensed to adapt all or part of the Works to the Medium, which said royalties shall be determined after deducting any cost incurred by the Publisher in negotiating and administering such use or license[.]" *Id.* at 3.a.(1)-(4).

9. The Agreement is limited to publishing *The Death of Christian Culture* and *The Restoration of Christian Culture* (hereinafter "Books"). *Id.*

10. On January 1, 2014, the Agreement's self-executing termination provision took effect and automatically ended the Agreement. *Id.* at § 6.

11. Neither party noticed that the Agreement had been terminated and continued in their normal course of performance or course of dealing for nine years until the parties' relationship began to spoil in early 2023. Ex. B – May 12, 2023 Email Correspondence.

12. Thereafter, the agreement between the parties was based on UNIFORM COMMERCIAL CODE § 1-303 and VA. CODE ANN. § 8.1A-303.

13. The course of performance and/or course of dealing after the termination of the Agreement is evidenced by the following:

    a.    From January 1, 2014, to May 13, 2023, IHS continued to print and sell the Books;

    b.    During that time, IHS continued to pay royalties according to the percentages allocated by the Agreement,

    c.    IHS and Plaintiff discussed future business for new published works; and,

    d.    Plaintiff, knowing that IHS continued to sell the Books, had the opportunity to object, but acquiesced to IHS' selling of the Books.

14. During these nine years in which the Parties' relationship was based on the course of performance, dealing, or business, Defendant IHS paid a 25% royalty on sales of the Books, but then acknowledged in 2023 that it had failed to pay Senior for some period of royalties on sales.

15. Sometime after the termination of the Agreement, IHS began to ask Senior for the rights to publish another work covering education written by Dr. John Senior (hereinafter "School Book"). At the time, Senior was interested in the proposition.

16. IHS also sought to maintain its exclusive rights to publish the Books, but did not offer Senior a written contract.

17. When the parties realized that the Agreement had been terminated, IHS repeatedly promised to draft a new contract to secure its rights to the Books and obtain the rights to publish the School Book, but never proffered a draft agreement.

18. Senior decided to terminate the Agreement because of the difficulties he experienced doing business with IHS.

19. During this period of renegotiation for a new contract, IHS unilaterally took it upon itself to print 2,500 new copies of the books without Senior's knowledge or permission.

20. Believing the books had already been printed and on the strength of the assurance, a new written agreement was going to be proffered, Senior acquiesced.

21. IHS, however, had not in fact printed the books, but instead used the *fait accompli* to pressure Senior to agree to a new contract.

22. When the contract was not proffered, when no royalties were paid, and after learning the books had not been printed before Senior acquiesced, he decided to terminate the relationship.

23. Upon information and belief, IHS subsequently printed the limited run of the Works despite not having a contract with Senior.

24. On May 13, 2023, Senior wrote that "[t]o resolve the past [with IHS], I would request that you remit to me the royalties owed which you have recently stated, minus the 2k [sic] you already sent, and minus a due amount from my overseas adventures, and minus the 1K [sic] advance that was made. When that is done, I would like to consider the matter to be resolved and concluded. I would like to consider the old contract to be officially terminated." Ex. C - Senior Email Correspondence.

25. The Parties' course of conduct continued from that point until May 13, 2024, when Undersigned Counsel wrote to IHS reiterating that no contract existed and demanding an accounting of, *inter alia*, the Books sold and the royalties owed to Plaintiff.

26. Despite this, IHS still claims the exclusive rights to publish the Works. Ex. D – IHS Email Correspondence.

27. Moreover, IHS claims that it has the exclusive right to publish the School Book. *See Id.*

28. Finally, IHS continues to wrongfully withhold Senior's royalty payments.

## COUNT 1:
## BREACH OF CONTRACT

29. Plaintiffs reiterate and adopt each of the allegations set forth in paragraphs (1) through (28) above.

30. "The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ramos v. Wells Fargo Bank, NA*, 289 Va. 321, 323 (2015) (citing *Filak v. George*, 267 Va. 612, 619 (2004)).

31. After the automatic termination of the Agreement on January 1, 2014, the agreement between the parties was based on course of performance and/or course of dealing as defined in VA. CODE ANN. § 18.A-303(a)-(b), (e)(1)-(2).

32. A "'course of performance' is a sequence of conduct between the parties to a particular transaction that exists if: (1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection." VA. CODE ANN. § 8.1A-303(a)(1)-(2).

33. "A 'course of dealing' is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." VA. CODE ANN. § 8.1A-303(b).

34. In the instant case, the relationship between the Plaintiff and Defendant after the termination of the Agreement on January 1, 2014, can be categorized as a quasi-contract through either course of performance or course of dealing.

35. Specifically, the course of performance and/or course of dealing is evidenced by IHS continuing to publish the Works, paying royalties according to the percentages allocated by the Agreement, and discussing future business for new published works. Ex. B, C, and D – Email Evidence.

36. The terms of the course of performance and/or the course of dealing are to be determined by and in the light of the terminated contract, pursuant to Va. Code Ann. § 8.1A-303(e)(1)-(2).

37. Senior and IHS entered into a contract, Exhibit A, for the rights to publish Senior's intellectual property; the terms of the Agreement speak for themselves.

38. The material terms of the Agreement were:

    a. That Plaintiff granted to IHS exclusive rights to print, publish, distribute, and sell the Books, *The Death of Christian Culture* and *The Restoration of Christian Culture*;

    b. That IHS would pay royalties to Plaintiff as consideration for those rights;

    c. That the agreement was to expire on January 1, 2014;

    d. That IHS would allow Plaintiff to extend the agreement, under the same or similar terms, prior to its scheduled expiration;

    e. That IHS would not unreasonably withhold consent to the renewal or extension of the agreement;

    f. That all rights would revert to the Plaintiff upon expiration of the agreement.

See Exhibit A, Memorandum of Agreement for Exclusive Publication Rights.

39. IHS breached this contract by refusing to pay Senior royalties according to that contract.

40. Additionally, IHS breached the contract by refusing to provide records and documents sufficient to show the Works' revenue, preventing Senior from accurately calculating his royalties.

41. First, Senior has been damaged due to IHS's breach of contract, because he has not received the money due and owed to him under the contract.

42. Second, Senior has been damaged by IHS withholding royalties as a negotiating tactic to pressure Senior into signing another contract with IHS.

43. Third, and related to the foregoing, Senior has been damaged because his rights to the Works are unclear. IHS is still claiming the rights to publish the Works, which prevents Senior from entering into a new contract with another publisher.

44. WHEREFORE, and for the forgoing reasons, Plaintiff respectfully requests that the Court enter judgment against the Defendant in the amount of $50,000 at 6% interest, plus all other damages and consequential damages for infringement of Seniors' copyright, the complete amount to be shown at trial, court costs and attorneys' fees, and any other remedy the Court deems to award.

### COUNT 2:
### CONVERSION
### *(In the Alternative)*

45. Plaintiff reiterates and adopts each of the allegations set forth in paragraphs (1) through (28) above.

46. "Any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith, may be treated as a conversion, and it is not necessary that the wrongdoer apply the property to his own use. And when such conversion is probed, the plaintiff is entitled to recover, irrespective of good or bad faith, care or

negligence, knowledge or ignorance." *Universal C.I.T. Credit Corporation v. Kaplan*, 198 Va. 67, 75 (1956) (quoting 19 MICHIE'S JUR. OF VA. AND W. VA. LAW, Trover and Conversion, § 4, p. 27 (1948)).

47. "The general rule in the Commonwealth is that an action for conversion applies only to tangible property. This general rule, however, does not stand for the proposition that money cannot be the subject of conversion." *Gold v. Chaplin*, 79 Va. Cir. 155, 156 (Fairfax Cty. Cir. Ct. 2009) (citing *United Leasing Corporation, et al. v. Thrift Insurance Corporation, et al.*, 247 Va. 299 (1994)). Thus, the tort of conversion includes any "act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it."

48. If the Court finds that no contract of any nature existed between the parties after the automatic termination of the Agreement, damages may still be awarded under a theory of conversion.

49. Senior has a right to receive the royalties IHS wrongfully withholds, and the best evidence of the proportion of the royalties due to him is the Agreement, even if the Agreement itself is not enforceable.

50. IHS's refusal to pay the royalties to Senior means that IHS wrongfully benefits by wrongfully withholding royalty payments that rightly belong to Senior.

51. "Cash can be the subject of a conversion claim . . .", *PGI, Inc. v. Rathe Prods., Inc.*, 265 334, 344 (2003), which includes projected payments based on intangible agreements prior to their having been "reduced to tangible cash . . ." such as stocks, or, as here, royalties. *Peele v. Twisted Crab Chesapeake Square, L.L.C.*, 113 Va. Cir. 304, 310 (Chesapeake Cty. Cir. Ct. 2024).

52. Consequently, "by wrongfully exercising dominion over the [royalties] and depriving [Senior] of their possession, [IHS] committed conversion" *Mackey v. McDannald*, 298 Va. 645, 661-62 (2020).

53. Given that the precise amount converted by the Defendant is readily ascertainable and identifiable by reference to the terms of the terminated Agreement, easily identifiable because of the Agreement, and because the royalty payments legally owed by the Defendant have not been paid and remitted to the Plaintiff, the Defendant is liable for conversion.

54. WHEREFORE, and for the forgoing reasons, Plaintiff respectfully requests that the Court enter judgment against the Defendant in the amount of $50,000 at 6% interest, plus all other damages and consequential damages for infringement of Seniors' copyright, the complete amount to be shown at trial, court costs and attorneys' fees, and any other remedy the Court deems to award.

### COUNT 3:
### COPYRIGHT INFRINGEMENT

55. Plaintiff reiterates and adopts each of the allegations set forth in paragraphs (1) through (28) above.

56. "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or right of the author, as the case may be. For purposes of this chapter (other than section 506), any reference to copyright shall be deemed to include the rights conferred by section 106A(a)." 17 U.S. CODE § 501(a).

57. "Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending . . . ." 17 U.S CODE § 106.

58. Senior is the sole and exclusive owner of the copyright to the Works at all times relevant to this action, holding all rights, title, and interest therein.

59. Senior's copyright was infringed by IHS's printing of the Books from May 13, 2023 to the present day without permission.

60. IHS further infringed on Senior's copyright by persistently asserting, both verbally and in writing, that it possessed lawful permission and exclusive rights to sell and distribute the Books, and that a valid agreement with Senior remained in effect, despite the termination of original Agreement.

61. The combined effect of IHS's copyright infringement and the wrongful conversion of royalties has created a significant cloud on the title of the Works, effectively preventing Senior from entering new licensing or publishing agreements with other potential publishers.

62. As a direct result of Defendant's breaches and infringements, Senior has suffered damages and consequential damages in an amount to be determined at trial.

63. Consequently, Plaintiff asks for impoundment of infringing materials in Defendant's possession pursuant to 17 U.S.C. § 503, damages and profits pursuant to 17 U.S.C. § 504, and attorneys' fees pursuant to 17 U.S.C. § 505.

64. WHEREFORE, and for the forgoing reasons, Plaintiff respectfully requests that the Court enter judgment against the Defendant in the amount of $50,000 at 6% interest, plus all other damages and consequential damages for infringement of Seniors' copyright, the complete amount to be shown at trial, court costs and attorneys' fees, and any other remedy the Court deems to award.

## COUNT 4:
### INJUNCTION

65. Plaintiff reiterates and adopts each of the allegations as set forth in paragraphs (1) through (28) above.

66. "There is no great difference between federal and Virginia standards for preliminary injunctions. Both draw upon the same equitable principles." *Capital Tool & Mfg. Co. v. Maschinenfabrik Herkules*, 87 F.2d 171, 173 (4th Cir. 1988) (citing VA. CODE ANN. § 8.1-628).

67. To be awarded an injunction, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007) (citing *eBay Inc. v. Merc Exchange, L.L.C.*, 547 U.S. 388 (2006)).

68. "[W]hen a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a "possibility" of irreparable harm. *Winter v. NRDC, Inc.*, 555 U.S. 7, 21, 129 S. Ct. 365, 375 (2008) [internal citations omitted].

69. "Any court having jurisdiction of a civil action arising under [17 U.S. Code Chap. 5 – Copyright Infringement and Remedies] may . . . grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a).

70. Each of the four factors federal courts consider when determining whether to grant an injunction shall be addressed below. *Id.*

71. First, the Plaintiff has suffered and continues to suffer irreparable injury, specifically the unauthorized printing, publication, and commercial exploitation of the Plaintiff's deceased father's life's work, which constitutes the Plaintiff's sole and exclusive intellectual property, without any form of compensation or authorization.

72. Second, monetary damages alone are insufficient to adequately compensate for the unique and ongoing injury to intellectual property rights, as recognized in 17 U.S.C. § 502(a).

73. Monetary damages will only recompense the Plaintiff for the injuries he has already suffered, but will not prevent such injuries from occurring in the future.

74. Without an injunction from the Court enjoining the Defendant from publishing the Plaintiff's intellectual property, the Defendant may continue to infringe the Plaintiff's intellectual property, thereby injuring the Plaintiff all over again.

75. The third factor is the balance of hardships between the parties.

76. The balance of hardship favors the Plaintiff for the following reasons:

    a. The Plaintiff possesses sole and exclusive right to determine if, when, and to whom he will grant publication, licensing or distribution rights for the Author's Books.

    b. Plaintiff has already suffered, and continues to suffer, the harm of having his royalties withheld by the Defendant

    a. Third, as long as the Defendant continues to publish the Works and assert claims to the underlying intellectual property rights, the Plaintiff's rights to the Author's Books remain encumbered and insecure, effectively preventing him from entering into agreements for publication or sale with a publisher of his choosing.

77. The balance of hardship does not favor the Defendant for the following reasons:

    a. First, the Defendant's exclusive license to publish the Books has expired, so an injunction recognizing this pre-existing reality will harm the Defendant;

    b. Second, the Defendant shall not be harmed if it is enjoined from publishing the Books, as publishing the Books now would be a breach of contract;

    c. Third, Plaintiff only seeks to enforce its rights under the Agreement. The defendant has inventory that must be impounded because of his lack of permission to sell such books.

78. Fourth, awarding the injunction would serve the public interest for several reasons.

    a. First, because it reinforces the fundamental legal principle of *pacta sunt servanda*, meaning agreements must be kept, which is essential for the stability and predictability of commercial and legal relationships.

    b. Second, publishers would be warned that they cannot violate an intellectual property holder's right. Specifically, publishers should pay according to their contracts and not breach contracts to gain leverage against an intellectual property owner.

    c. Third, the issuance of an injunction would strengthen the American intellectual property legal regime, essential to innovation and production in the American economy.

79. Equity is an appropriate remedy because the Plaintiff does not have an adequate remedy at law to address this situation. Specifically, because the Plaintiff does not want to sell his intellectual property, but wishes to license it to another publisher, but cannot do so until the rights to the Works and the School Book are clear.

80. WHEREFORE, Plaintiff seeks an injunction to prevent Defendant from publishing any of the Author's work; to impound all in-print copies of the Work and the School Book, if such exists, and any other restriction or action necessary to secure the rights of the Plaintiff in his intellectual property.

## AD DAMNUM

**WHEREFORE**, and for the foregoing reasons:

a. Plaintiff seeks payment of all past due and owing royalty payments by Defendant under the terms of the terminated Agreement, totaling approximately $50,000, plus (6%) pre- and post- judgment interest, true amount to be proved at trial; or,

b. *In the alternative,* if the Agreement does not limit the Plaintiff's recovery to the royalties under the theory of conversion, the Plaintiff seeks the return of all wrongfully converted monies in the possession of the Defendant received pursuant to the unauthorized publication of the Plaintiff's intellectual property, totaling approximately $150,000, plus (6%) pre- and post- judgment interest, true amount to be proved at trial; or,

c. *In the alternative,* if the Agreement does limit the Plaintiff's recovery to the royalty provision in the Agreement, the Plaintiff seeks payment of all royalty payments converted by the Defendant, totaling approximately $50,000, plus (6%) pre- and post- judgment interest, true amount to be proved at trial; and,

d. Plaintiff seeks an award of compensatory damages to fully redress the injuries sustained, and punitive damages to punish the Defendant for its violation of the Plaintiff's intellectual property rights and to deter similar future conduct; and,

e. Plaintiff seeks an injunction to prevent Defendant from publishing any of the Author's work and from removing the books from the Defendant's catalog, website, and any promotional or marketing materials; and,

f. Plaintiff asks that the Court enter an order to impound all in-print copies of the Work and the School Book, if such exist, and any other materials embodying the copyrighted works; and,

g. The Plaintiff requests any other restrictions or affirmative action necessary to secure the Plaintiff's intellectual property rights;

h. The Plaintiff requests that any costs resulting from the enforcement of the judgment, inclusive of attorneys' fees incurred for judgment enforcement against the Defendant, be awarded; and,

i. Plaintiff requests the Court award attorneys' fees and costs to the Plaintiff in compensation for necessitating this suit despite the clear rights of the Plaintiff and the Defendant's bad faith refusal to disperse royalties to the Plaintiff; and,

j. The Plaintiff requests any and all other remedies the Court deems necessary and fit.

**Respectfully submitted this 27th day of June, *Anno Domini* 2025.**

Thomas F. Ranieri, Esq.
RANIERI & ASSOCIATES, PLC
33 Cedarside Court
Front Royal, Virginia 22630
Tel: (540) 502-5147
Email: ranieri@tra-lawfirm.com
*Counsel for Plaintiff*